## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | |
| | **NO. 19-157-JWD-EWD** |
| **JULIAN MARTINEZ-VELAZQUEZ** | |

### RULING AND ORDER

This matter comes before the Court on the *Motion to Suppress Evidence and Statements* (Doc. 23) filed by Defendant Julian Martinez-Velazquez ("Defendant"). The Government opposes the motion. (Doc. 25.) Following the September 30, 2020, evidentiary hearing (Doc. 37), both parties submitted post-hearing briefs (Docs. 44, 45, 46). Further argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

### I.    Relevant Background

#### A.  Overview

This motion centers on an encounter between Defendant and two Livingston Parish Sherriff's Office Deputies occurring on November 14, 2019, at his residence in Livingston, Louisiana. The facts surrounding the encounter are highly disputed.

As a result of that encounter, Defendant was indicted on one count of being an alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5)(A). (Doc. 1.) Thereafter, he moved to suppress his statements and the firearm, advancing several theories: (1) that he was seized in violation of the Fourth Amendment; (2) that he was not apprised of his *Miranda* rights and that he did not knowingly and voluntarily waive them; and (3) that the warrantless search of his truck was unconstitutional.

At the September 30, 2020 hearing, Defendant and Livingston Parish Sheriff's Office Deputies Phil Lint and Raul Sandoval testified. The details from the encounter come from the testimony developed at the suppression hearing. The following sections are taken from this evidence and are a summary of the events leading up to Defendant's arrest.

As a general matter, the Court listened to the testimony of the officers and observed their demeanor on the stand, and the Court found them highly credible. In contrast, the Court found Defendant's testimony to be contradictory, inconsistent, evasive, and unbelievable.

**B.  The Scene**

On November 14, 2019, Livingston Parish Sheriff's Office Deputies Phil Lint and Raul Sandoval were dispatched to a gas station to meet M.B. (Tr. 4, 28, Doc. 41.) M.B. informed the Deputies that she was in a dating relationship with Defendant. M.B. stated that she and Defendant were in a domestic dispute at their residence, during which he threatened her with a firearm, told her to leave the residence and did not allow her to retrieve her belongings or her minor child. (Tr. 7, 27.)

The deputies then proceeded to the residence located at 17080 Lisa Drive, Livingston, Louisiana. As depicted below, the residence is surrounded by a chain link fence. On the day in question, the gate at the entrance was open. (Tr. 12, 65.)

2



(Gov. Ex. 26.)

Upon arrival at the residence, the deputies parked their patrol car on Lisa Drive, a public road. Both deputies testified that they could see the Avalanche in the front yard of the residence from the public street. (Tr. 12, 29.) The Avalanche was parked as depicted by Deputy Raul Sandoval's initials "R.S." enclosed in a square below:



(Gov. Ex. 14-a; Tr. 30, 51, 61, Doc. 41.)

As the deputies approached the residence by walking up Defendant's driveway, both deputies testified that they saw Defendant exit the driver's side of an Avalanche truck. (Tr. 13, 29.) Similarly, Defendant testified that he was in the Avalanche when law enforcement arrived. (Tr. 48, 60, 61.) After exiting his truck, Defendant walked around to the back of his truck, lowered the tailgate, and sat down.  (Tr. 13-15, 29-30, 63.)

### C.  The Officers' Testimony

Upon approaching Defendant, Deputy Lint testified that he and Deputy Sandoval identified themselves as deputies and asked if they could speak with him. (Tr. 13, Doc. 41.) After Defendant agreed to speak with them, Deputy Lint instructed Deputy Sandoval to advise Defendant of his Miranda rights. (Tr. 13.) Sandoval is a native Spanish speaker and communicated with Defendant in Spanish. (Tr. 24-25.) As to this, Sandoval testified:

Q.      And did you advise him of his rights?

A.      Well, as soon as we made contact with him -- it was a dark area. It was already nighttime. I asked him for permission for officer safety, and I explained myself, if he didn't mind so I could pat him down. We did a patdown of the suspect for officer safety. We located a blade. He said he was working sheetrock, so it was a small blade. We put that on top of the truck and then he sat down again and then I told him that I was there to investigate a complaint and I wanted to advise him of his rights because I had a few questions to ask him, which I did in Spanish.

(Tr. 31.)

When Sandoval asked Defendant whether he understood his rights, Defendant responded "yes." (Tr. 31) Sandoval testified that he did not notice any signs that Defendant may not have understood him. (Tr. 32.)

After being advised of his rights, Defendant began conversing with Sandoval in Spanish. Sandoval asked Defendant about M.B.'s allegations of an altercation and about the juvenile who was present during the altercation. (Tr. 32.) Sandoval also asked Defendant for his driver's license.

Specifically, Sandoval testified:

Q.      Did you ask him for any form of ID?

A.      Yes. We asked him for his license -- if he had a license and he said that he did not have a license.

Q.      Did he tell you why he didn't have a license?

A.      Yes, sir. He said he didn't have a license because he didn't have papers.

Q.      Meaning he didn't have papers -- what does that mean?

A.      He told me that he was here illegally.

(Tr. 32.)

Concerned about the earlier allegations involving a firearm, Sandoval asked Defendant if he had a firearm, to which Defendant responded "yes." (Tr. 33.) Defendant then told Sandoval that

5

the firearm was in his truck and that "the firearm was legal." (Tr. 33.) When Sandoval asked Defendant if he could retrieve the firearm and check it, Defendant told him he could. (Tr. 33.) According to Sandoval, he did not threaten Defendant or use any handcuffs or weapons in connection with the conversation or during the search. (Tr. 34-35.)

After retrieving the gun from Defendant's truck, the deputies went back to Lint's patrol car and conducted a serial number check on the firearm and secured it. They also contacted border patrol about "an individual who admitted to being illegal and [] was in possession of a gun or firearm." (Tr. 36.) Border Patrol then told the deputies to detain Defendant. According to the deputies, it was at that point that Defendant was "detained" and was placed in handcuffs and escorted to Lint's vehicle. (Tr. 19.) Thereafter, the deputies met with Border Patrol and released Defendant and the firearm into their custody. (Tr. 20.)

Importantly, both deputies testified that throughout the encounter, Defendant showed no signs of unwillingness or un-cooperation. (Tr. 18, 23, 34-35.) Specifically, Lint stated, that based off the Defendant's body language, "he was cooperative the whole way; just swinging his feet off the tailgate like it was no big deal." (Tr. 23.) Likewise, Sandoval described the encounter as "very pleasant" and stated that Defendant "was very direct with all the answers that he gave us." (Tr. 35.)

### D. Defendant's Testimony

Defendant gave a very different version of events. Defendant testified that he believed the deputies needed an order or a warrant to enter his property and conduct their investigation. (Tr. 49, 50, 51, Doc. 41.) Because the deputies refused to present an order or warrant, Defendant asserted that he declined to cooperate with their investigation. (Tr. 49, 51.)

Regarding being read his *Miranda* rights, Defendant first testified that Sandoval advised him of "something," but that he did not understand him. (Tr. 52.) Then on cross-examination, Defendant admitted that, rather than not having his rights read to him, as he had previously testified, Sandoval read him his rights in Spanish, but he did not *accept* his rights. (Tr. 64.) He further testified that he understood Sandoval when he was speaking to him in Spanish. (Tr. 69.)

At the hearing, Defendant said he did not have a license because he was in the country illegally. (Tr. 65.) He admitted that the deputies asked if he had a driver's license on the day in question. However, according to Defendant, after he told the deputies he didn't, they never asked him why he did not have a license. (Tr. 66.)

Specifically, Defendant testified:

Q.    Did they ask you for identification?

A.    Yes. But I didn't show it to them because I wanted to know again what was the reason for them to be in my house.

Q.    Did you tell them that you were here illegally?

A.    No. He asked me if I had papers and I told him that he was not from immigration to request them.

(Tr. 52.)

And later Defendant stated:

Q.    Did the officers ask you that; why you don't have a license?

A.    No.

Q.    So, they asked for your license, you didn't have one. And your testimony is that they didn't ask you why you don't have a license?

A.    Yes.

(Tr. 65-66.)

Regarding the firearm, Defendant admitted that he told the deputies he had a gun. He stated: "I only told them that [the firearm] was in the truck, but I didn't tell them where." (Tr. 68.) He also acknowledges that the officers asked permission to retrieve the gun from his truck, although he denies giving consent for them to do so. (Tr. 50, 68.)

When asked if he had an argument with M.B., Defendant initially said no. (Tr. 56-57.) Then he admitted he did have an argument, but only "a regular one." (Tr. 57.) When asked whether he had a firearm when he argued with M.B., Defendant's testimony was evasive, inconsistent, and contradictory. (Tr. 58, the gun was in the house in his dresser when he argued with M.B. near his truck; Tr. 67, he moved the gun to his truck after the argument with M.B.; Tr. 71-73, the gun was in his lap when he argued with M.B.)

Defendant also testified that the deputies did not ask permission to search his person and denies that a pat down occurred. (Tr. 49, 73.)

## II.    Discussion

Primarily at issue are whether: (1) the deputies lawfully entered Defendant's property; (2) Defendant's encounter with the deputies was consensual, rather than a seizure under the Fourth Amendment; (3) Defendant was read his *Miranda* rights and voluntarily waived them; and (4) he consented to the deputies retrieving a firearm from his truck. The Court will take these issues in turn.

### A.  Entry onto Property

#### 1. Parties' Arguments

Defendant argues that the deputies needed a writ or warrant to enter his property and to question him. In opposition, the Government contends that the deputies lawfully entered the front yard of Defendant's residence because he did not have an objectively reasonable expectation of

privacy. (Doc. 25 at 3 (citing *California v. Greenwood*, 486 U.S. 35, 39 (1988); *United States v. Moffitt*, 233 F. App'x 409, 411-412 (5th Cir. 2007)).) The Government also maintains that a driveway—where the deputies initially encountered Defendant—is not part of the curtilage of the home. (*Id*. at 5.)

### 2. Applicable Law

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)).

To determine whether a defendant has a reasonable expectation of privacy in his front yard or driveway, the Supreme Court stated:

> The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. The concept plays a part, however, in interpreting the reach of the Fourth Amendment. *Hester v. United States,* 265 U.S. 57, 59, 44 S. Ct. 445, 446, 68 L. Ed. 898 (1924), held that the Fourth Amendment's protection accorded "persons, houses, papers, and effects" did not extend to the open fields, the Court observing that the distinction between a person's house and open fields "is as old as the common law. 4 Bl. Comm. 223, 225, 226."
>
> We reaffirmed the holding of *Hester* in *Oliver v. United States, supra.* There, we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 466 U.S., at 180, 104 S. Ct., at 1742. We identified the central component of this inquiry as whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Ibid.* (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746 (1886)).

Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 300–01, 107 S. Ct. 1134, 1139, 94 L. Ed. 2d 326 (1987).

Applying the four-part test announced in *Dunn*, the Fifth Circuit found:

While curtilage is entitled to those same Fourth Amendment protections that attach to the home, *Oliver v. United States,* 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L.Ed.2d 214 (1984), here, the CI did not enter curtilage. A four-factor test is used to determine if an area is within the curtilage of the house: (1) the proximity of the area to the home, (2) whether it is within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from outside observation. *United States v. Thomas,* 120 F.3d 564, 571 (5th Cir. 1997) (citing *United States v. Dunn,* 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)). "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration-whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment Protection." *Dunn,* 480 U.S. at 301, 107 S. Ct. 1134.

Applying the four factors, we find that Moffitt's driveway and the yard in front of his house are not areas "so intimately tied to the home" that they are protected curtilage. The first two factors weigh in favor of the area being curtilage, as the driveway was located directly next to the house, and Moffitt had enclosed the yard and house with a chain-link fence. However, the third factor-"the nature of uses to which the area is put"-weighs against this area being curtilage. *See id.* at 301, 107 S. Ct. 1134. Moffitt's driveway and front yard were access areas for visitors to enter and knock on the front door. With an open gate in an urban neighborhood, Moffitt could not have reasonably expected to keep neighbors, door-to-door salespeople, and trick or treaters from driving or walking to his house and approaching his front door. It follows therefrom that if he has a reasonable expectation that various members of society may enter his property, he should find it equally likely that the police, or a police-hired informant, will do so. We also find that Moffitt fails the fourth factor as he did not take "steps ... to protect the area from outside observation." *Id.* at 301, 107 S. Ct. 1134. While his yard is surrounded by a chain-link fence, on which hung four "no trespassing" signs, this chain-link fence was see-through and did not protect the yard from outside observation. When the CI approached the property, the gate leading to Moffitt's driveway was open. Moffitt might have subjectively manifested his expectation of privacy by posting "no trespassing" signs, but with a driveway open to neighbors and solicitors, it is not an expectation that society is prepared to accept as legitimate. *See California v.*

*Greenwood,* 486 U.S. 35, 39, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) ("An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable."). Thus, we conclude that Moffitt exposed his driveway and yard to the public sufficiently to defeat his claim to Fourth Amendment protection.

*United States v. Moffitt*, 233 F. App'x 409, 411-412 (5th Cir. 2007); *see United States v. Ardoin*, No. CRIM.A. 10-29-JJB-CN, 2010 WL 4056191, at *2 (M.D. La. Oct. 14, 2010), *aff'd,* 454 F. App'x 385 (5th Cir. 2011) ("These factors notwithstanding, the Fifth Circuit has consistently held that a driveway is not a curtilage of an individual's home."); *United States v. Alvarez*, 213 F.3d 636 (5th Cir. 2000).

### 3. Analysis

The Court finds that the deputies' entry onto Defendant's property was lawful. Defendant's driveway and the yard in front of his house are not areas "so intimately tied to the home" that they are protected curtilage.

Like in *Moffit*, Defendant's front yard is surrounded by a chain-link fence. However, the chain-link fence is see-through and does "not protect the yard from outside observation." Deputies Lint and Sandoval both indicated in their testimony that they could see the Avalanche in the front yard from the public street. Further, when the deputies approached the property, the gate to the property was open. As in *Moffitt*, by leaving the gate open, Defendant "could not have reasonably expected to keep neighbors, door-to-door salespeople, and trick or treaters from driving or walking to his house and approaching his front door. It follows therefrom that if he has a reasonable expectation that various members of society may enter his property, he should find it equally likely that the police […] will do so." *Moffitt*, 233 at 411-412. Therefore, the deputies' initial entry onto Defendant's front yard did not violate his Fourth Amendment rights as the yard is not an area "so intimately tied to the home" as to be protected curtilage.

11

For the same reasons, Defendant's driveway is also not considered curtilage. *See United States v. Beene*, 818 F.3d 157, 162-163 (5th Cir. 2016); *United States v. Ardoin*, No. 10-29-JJB-CN, 2010 WL 4056191, at 2-3 (M.D. La. Oct. 14, 2010)). In *Moffitt*, the driveway found by the Court not to be entitled to Forth Amendment protection was "located directly next to the house." *Moffitt,* 233 at 422. Here, there was some distance between the driveway where Defendant's truck was parked and the front of the house. As such, neither the deputies' initial entry onto Defendant's front yard nor their initial encounter with Defendant in his driveway violated his Fourth Amendment rights.

### B. Custodial Status

#### 1. Parties' Arguments

Defendant avers that the deputies exceeded the scope of a welfare check when they searched his person, questioned him about his immigration status, and searched his vehicle. (Doc. 44 at 6; Doc. 46 at 3.)

According to Defendant, once the deputies determined that the minor child was safe, they had no probable cause to believe he had committed any acts violating state law. (Doc. 44 at 9.) He argues:

> While it is proper for the officers to question a subject about an alleged threat of harm while armed, such questioning does not implicate immigration status. As noted herein, the deputies found this to be more of a civil custody matter, and had no probable cause to arrest for violation of state law. The investigation went from specific to more general, as the deputies decided to go outside of the scope of their duties for the Livingston Parish Sheriff's Office, and self-deputized themselves as immigration officers.

(Doc. 44 at 7.)

As a result of the deputies expanding the detention beyond the required time and information needed to clear away the probable cause for the potential offenses complained of,

Defendant contends that his detention was turned into a full-blown search. (Doc. 46 at 3.) He further contends that he was seized within the meaning of the Fourth Amendment when he sat on the tailgate of his truck with the deputies in "close proximity [] so as to keep him in place to answer questions." (Doc. 44 at 5.)

The Government characterizes Defendant's entire encounter with the deputies as entirely consensual. (Doc. 45 at 11.) As Deputy Sandoval testified, his conversation with Defendant was "a very pleasant conversation." (Tr. 35.) Alternatively, the Government contends that it had reasonable suspicion to detain Defendant based on M.B.'s allegations that he would not allow her to retrieve her minor son from the residence after Defendant pulled a firearm on her. (Doc. 45 at 10.) Further, the actions of the deputies did not exceed the scope of a *Terry* stop, because it was reasonable for them to ask questions to identify Defendant, to determine if he had a firearm, and to ask for his side of the story. (*Id.*)

### 2. Applicable Law

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (quoting U.S. Const. amend. IV). "[T]he Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *Cardenas*, 9 F.3d at 1147 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). The government bears the burden of justifying a warrantless search. *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995) (per curiam).

"The law regarding the seizure of persons is well developed." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (collecting case). "Not all encounters between law enforcement

officers and citizens are seizures for purposes of the Fourth Amendment." *Mask*, 330 F.3d at 336 (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

"There are three recognized types of encounters between law enforcement officers and citizens, including: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment." *United States v. Williams,* 365 F.3d 399, 403–04 (5th Cir. 2004) (citing *United States v. Cooper*, 43 F.3d 140, 145–46 (5th Cir. 1995)). "A voluntary encounter between an officer and a citizen may ripen into a seizure, triggering the Fourth Amendment and requiring officers to be able to articulate reasonable suspicion or probable cause, 'only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.' " *Mask*, 330 F.3d at 336 (quoting *Terry*, 392 U.S. at 19).

The Government has the burden of proving that an encounter was consensual rather than coercive. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)); *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (collecting cases). "In deciding if an encounter between the police and a private citizen is consensual, the district court must determine if a reasonable person in the circumstances described would feel free to disregard the officers and proceed with his or her own business." *Williams*, 365 F.3d at 404 (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) ); *see also Mask*, 330 F.3d at 336 ("The test provides that an individual has been seized for Fourth Amendment purposes 'only if, in view of all of the circumstances surrounding the incident, a reasonable person

14

would have believed that he was not free to leave.' " (quoting *Mendenhall*, 446 U.S. at 554; *INS v. Delgado,* 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)).

"The test for whether a seizure occurred is necessarily imprecise because it seeks to measure the coercive effect of police conduct when viewed as a whole." *Mask*, 330 F.3d at 337 (citing *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573–74 (citing *Mendenhall, supra*; *Delgado*, *supra*). The Court should "eschew[ ] focusing on the particular details of that conduct in isolation," *Mask*, 330 F.3d at 337, and instead look at the " 'totality of the circumstances,' " *Williams*, 365 F.3d at 404 (quoting *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)). However, there are "several non-exclusive considerations that may argue in favor of a determination that the defendant had been seized: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *Mask*, 330 F.3d at 337 (citing *Mendenhall*, 446 U.S. at 554).

Nevertheless, "[w]hile the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police." *Chesternut*, 486 U.S. at 574. "This 'reasonable person' standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." *Mask*, 330 F.3d at 336 (citing *Chesternut*, 486 U.S. at 574, 576 n. 7). "The test's objective standard ... allows

15

the police to determine in advance whether the conduct completed will implicate the Fourth Amendment." *Chesternut*, 486 U.S. at 574 (citation omitted).

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. at 497 (citing *Dunaway v. New York*, 442 U.S. 200, 210 n. 12, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)); *Terry*, 392 U.S. at 31, 32–33 (Harlan, J., concurring); *id.*, at 34 (White, J., concurring); *see also Mendenhall*, 446 U.S. at 553 (Opinion of Stewart, J.) ("[T]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." (quoting *Terry*, 392 U.S. at 34 (White, J., concurring)). "Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons,' although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.' " *Mendenhall*, 446 U.S. at 553 (Opinion of Stewart, J.) (quoting *Terry*, 392 U.S. at 31, 32–33 (Harlan, J., concurring)); *see also Royer*, 460 U.S. at 497 ("The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way." (citation omitted)). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." *Royer*, 460 U.S. at 497 (citing *Mendenhall*, 446 U.S. at 555 (Opinion of Stewart, J.)). Thus, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 200–01 (citing *Florida v. Bostick*, 501 U.S. at 434–35; *see also Williams*, 365 F.3d at 404 (citing *Drayton*, 536 U.S. at 200–01).

16

### 3. Examples from Case Law

Several cases illustrate the above principles. In *Florida v. Royer*, the Supreme Court affirmed the finding of an unlawful seizure in an airport. *Id*., 460 U.S. at 501. The Supreme Court explained:

> Asking for and examining [defendant's] ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told [defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [defendant] was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' [*Mendenhall*, 446 U.S. at 554 (Opinion of Stewart, J.)].

*Royer*, 460 U.S. at 501–02.

However, in finding that there was no seizure during a drug interdiction on a bus in *Drayton*, the Supreme Court found that there were "ample grounds" for the district court's conclusion that the officer's interaction with the defendant was " 'cooperative' " and that there was " 'nothing coercive [or] confrontational' about the encounter." *Drayton*, 536 U.S. at 204.

In *Drayton*, officers boarded a bus in Florida and began asking passengers if they could search their bags. *Id*. at 197. The officers noticed two men wearing baggy clothing and asked one if he minded being searched. *Id*. at 198–99. The man consented, and officers patted him down, detected drug packages strapped to the man's thighs, and took him off the bus in handcuffs. *Id*. at 199. When they asked Drayton (in the adjacent seat) if they could pat him down ("Mind if I check you?"), Drayton "responded by lifting his hands." *Id*. When an officer patted down Drayton, he discovered Drayton had taped bundles of cocaine to his thighs. *Id*. Drayton argued that he had been seized, but the Supreme Court held otherwise: "There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no

threat, no command, not even an authoritative tone of voice." *Drayton*, 536 U.S. at 204. The Supreme Court concluded: "It is beyond question that had this encounter occurred on the street, it would be constitutional." *Drayton*, 536 U.S. at 204.

Similarly, in *Williams*, the Fifth Circuit affirmed the denial of a motion to suppress and, in doing so, found that an encounter with law enforcement at a bus terminal was consensual. *Williams*, 365 F.3d at 408. The defendant argued that, though he initially cooperated with the officers, "by the time he was escorted to and from the baggage handling area, separated from the other passengers, and repeatedly asked for consent to search his backpack, the questioning had become a non-consensual detention." *Williams*, 365 F.3d at 403. The appellate court rejected the defendant's argument, finding *Drayton* directly on point. *Id*. at 404. The Fifth Circuit emphasized the reasonable explanation for moving to the baggage handling area and the facts (1) that the defendant was "not subjected to a restrictive environment" at the baggage handling area; (2) that "[t]here [was] nothing coercive about [the officers'] questions" and that "the officers did not demand answers to their questions, leaving [the defendant] free to decide whether to answer"; and (3) that the "officers ... displayed no weapons, and by all accounts maintained a professional decorum." *Id*. at 404–05.

In addition, the Fifth Circuit recently affirmed this Court's finding that no seizure occurred during a consensual encounter. *See United States v. Carroll*, No. CR 18-13-JWD-RLB, 2018 WL 6576408, at *12 (M.D. La. Dec. 13, 2018), *aff'd*, 812 F. App'x 255 (5th Cir. 2020). The Fifth Circuit explained:

> In determining whether a seizure occurred, the applicable test is whether a reasonable person would not feel free to leave or to terminate the encounter. *United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002). We consider the totality of the circumstances, including the following non-exclusive factors, to determine when a reasonable person would feel free to terminate an encounter: "(1) the threatening presence of several officers; (2) the

display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *Mask*, 330 F.3d at 337.

In this case, the factors identified in *Mask* support the district court's finding that the encounter at issue was consensual and not coercive. The encounter was initiated by Carroll when he and another individual approached and sought to speak with one of the officers while he was already stopped in his patrol vehicle. After the encounter began, the officers merely spoke with and asked questions of Carroll. Notably, during the relevant portion of the encounter, the evidence at the suppression hearing established that the officers never (i) used force, violence, or threats; (ii) displayed or brandished their service weapons; (iii) physically touched Carroll; (iv) searched, took, or held any of Carroll's property; (v) issued orders, commands, or threats to Carroll; (vi) raised their voices or spoke in an authoritative tone; or (vii) told Carroll that he was under investigation or could not leave. *See Drayton*, 536 U.S. at 204, 122 S. Ct. 2105. Furthermore, the evidence showed that the officers never subjected Carroll to "a restrictive environment," and they "did not demand answers to their questions, leaving [Carroll] free to decide whether to answer." *United States v. Williams*, 365 F.3d 399, 404-05 (5th Cir. 2004). Accordingly, we conclude that the district court did not clearly err in finding that there was no seizure.

*United States v. Carroll*, 812 F. App'x 255, 256–57 (5th Cir. 2020).

### 4. Analysis

Having carefully considered the law and facts in the record, the Court finds that Defendant's motion should be denied. Looking at the *Mendenhall* factors, (1) the presence of the two deputies here was in no way threatening; (2) no weapons were displayed; and (3) Sandoval's language and tone were not such that "compliance with [his] request might be compelled." *Mask*, 330 F.3d at 337 (citing *Mendenhall*, 446 U.S. at 554).

As to physical contact factor, Defendant argues that he was seized when Sandoval conducted a pat down of his person. (Doc. 44 at 5.) However, the Court notes that this is in direct conflict with Defendant's own testimony. Again, at the hearing, Defendant testified multiple times that Sandoval did not conduct a pat down of his person. (*See* Tr. 49, 73, Doc. 41.)

Therefore, to the extent that Defendant contends this pat down was a seizure, this argument is rejected.

Moreover, Defendant's testimony conflicts with Sandoval's, who testified multiple times that he did conduct a pat down of Defendant's person with his consent. (*See* Tr. 30-31, 41.) Accepting Sandoval's testimony as true, the Court finds that the pat down did not change the consensual nature of the encounter. Sandoval briefly patted Defendant down for his own safety. Sandoval did not raise his voice at Defendant, threaten Defendant, nor did he physically intimidate Defendant. Sandoval's pat-down was neither coercive nor intrusive, but rather *de minimus*. Further, when the pat down ended, Defendant was free to answer the officers' questions or to leave.

Additionally, this case is much closer to those decisions finding a consensual encounter than those finding coercion.  While, like *Royer*, the deputies never advised Defendant of his ability to leave, unlike *Royer*, the deputies did not retain any of the Defendant's possessions, such as a ticket, license, or luggage, which would have "effectively seized [Defendant] for purposes of the Fourth Amendment." *Royer*, 460 U.S. at 501–502. Indeed, the deputies held on to nothing belonging to Defendant until the deputies searched the vehicle and discovered the gun,[1] which meant that Defendant's freedom to leave was in no way restricted.

Rather, the deputies' testimony, which the Court found highly credible, shows that the encounter was consensual.  As in *Drayton*, the encounter was " 'cooperative,' " and there was " 'nothing coercive [or] confrontational' " about it.  *Drayton*, 536 U.S. at 204.  Further, as in *Drayton*, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even

---

[1] The question of whether Defendant consented to the search is addressed in another section of this Ruling.

an authoritative tone of voice." *Drayton*, 536 U.S. at 204.  On top of all of that, "[t]here [was] nothing coercive about [Sandoval's] questions," and he "did not demand answers to [his] questions, leaving [Defendant] free to decide whether to answer." *Williams*, 365 F.3d at 404–05. On the whole, Sandoval and Lint "by all accounts maintained a professional decorum." *Williams*, 365 F.3d at 404–05.

Moreover, Defendant was not physically or verbally restrained. On this point, Defendant asserts that the fact that the deputies were in close proximity to him on his tailgate to make him comply shows that he was in custody.  (Doc. 44 at 5.) The context of the encounter, however, indicates that any alleged "close proximity" did not constitute a show of authority or physical restraint. Again, both deputies testified that throughout the conversation, Defendant was not handcuffed and showed no signs of unwillingness or un-cooperation. (Tr. 18, 34.)

In sum, the Court finds that, based on the facts developed at the hearing, and the above case law, the encounter was consensual and not coercive. That is, under the totality of the circumstances, a reasonable person in Defendant's position would have felt he was free to leave and that he could have terminated the encounter with the deputies.

Although there may have been physical contact in the form of a pat down (based on Sandoval's testimony), considering how minimally intrusive the pat down was and that Defendant consented to it (based on Sandoval's testimony), it did not change the consensual nature of the encounter.

### C.  Defendant's Statements

#### 1. Parties' Arguments

Defendant denies having his Miranda rights explained to him and making inculpatory statements. (Doc. 23-1 at 1-2; Doc. 44 at 6, 7-8.) But he also admits that he did understand the rights as read to him by Deputy Sandoval. (Doc. 44 at 6, 7-8.)

The Government asserts that the testimony of both deputies proves Defendant was advised of his *Miranda* rights, confirmed that he understood them, and only then proceeded to make inculpatory statements. (Doc. 25 at 2; Doc. 45 at 7.) Alternatively, the Government contends that Defendant was not in custody for purpose of the Fifth Amendment and therefore *Miranda* does not apply. (Doc. 45 at 9-10.)

#### 2. Applicable Law

The Fifth Amendment provides in relevant part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the Supreme Court concisely laid out its holding with respect to this amendment as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not

> deprive him of the right to refrain from answering any further inquiries until he has
> consulted with an attorney and thereafter consents to be questioned.

*Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

"There is no talismanic incantation of phrases required to satisfy the strictures of

*Miranda.*" *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (citing *California v.*

*Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981)). "Nevertheless, the

*Miranda* safeguards are 'most commonly satisfied by giving the defendant the customary

*Miranda* warnings: That he has the right to remain silent, that anything he says can be used

against him in a court of law, that he has the right to the presence of an attorney, and that an

attorney will be provided for him if he cannot afford to hire one.' " *Id.* (quoting *United States v.*

*Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

"A valid *Miranda* waiver requires two distinct components." *United States v. Hearn*, 563

F.3d 95, 104 (5th Cir. 2009). " 'First, the relinquishment of the right must have been voluntary in

the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

or deception.' " *Id.* (quoting *Cardenas*, 410 F.3d at 293 (citation omitted)). " 'Second, the waiver

must have been made with a full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it.' " *Id.* (quoting *Cardenas*, 410 F.3d at 293). The

Government has the burden of proving a waiver of the Defendant's *Miranda* rights by a

preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S. Ct. 515,

522–23, 93 L. Ed. 2d 473 (1986).

Waivers can be done implicitly. For example, in *Hearn*, the Fifth Circuit affirmed the

district court's decision that the defendant knowingly and voluntarily waived her *Miranda* rights.

*Hearn*, 563 F.3d at 104. The appellate court summarized the relevant facts as follows:

> [F]our undercover officers approached Collins as she was entering the parking lot
> of the Diamond Jacks Casino; they identified themselves as officers; escorted

Collins into the parking garage; told her that they were investigating methamphetamine distribution; advised Collins of her *Miranda* rights; and asked her questions which she voluntarily answered.

*Id.*

Analyzing this, the Fifth Circuit explained: "Nothing about these facts suggests that Collins's decision to answer the officers' questions resulted from intimidation, coercion, or deception. Collins was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions." *Id.* (citing *North Carolina v. Butler*, 441 U.S. 369, 374–76, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) (rejecting argument that *Miranda* waivers can never be implicit); *United States v. Cazares*, 121 F.3d 1241, 1243 (9th Cir. 1997) ("To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights.")). Additionally, the Fifth Circuit noted that "Collins had extensive experience with law enforcement as evidenced by her criminal history category, and nothing in the record indicates that she lacked average intelligence or education." *Id.* The appellate court concluded, "Thus, by choosing to answer the officers' questions, Collins demonstrated her intent to forfeit the *Miranda* rights she had just been read. The district court considered the evidence and concluded that the consents were knowingly and voluntarily given. We find no error in this determination." *Id.*

### 3. Analysis

Preliminarily, the Court finds that Sandoval complied with *Miranda's* requirements. Both deputies testified that Sandoval read Defendant his rights in Spanish. Sandoval further testified that Defendant replied "yes" when asked if he understood his rights. (Tr. 31, Doc. 41.) *See United States v. Garcia Abrego*, 141 F. 3d 142, 171 (5th Cir 1998) (affirming the voluntariness of a confession when a defendant received the *Miranda* warnings in his native language.).

24

Turning to the heart of the matter, the Court finds that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Sandoval testified that, before Defendant made incriminating statements (or really any statements at all), Sandoval did not threaten him.  (Tr. 15.) Further at the time he was read his rights, Defendant was unrestrained and sitting on the tailgate of his truck.  (Tr. 31-32.)

According to Sandoval, Defendant never indicated that he did not understand what was going on, and, in fact, Defendant appeared to understand Sandoval, and "was very direct with all the answers that he gave us."  (Tr. 32, 35.) Lint's account was like Sandoval's with respect to the voluntariness of his statements. (*See* Tr. 23.) Again, both deputies testified that throughout the encounter, Defendant showed no signs of unwillingness or un-cooperation. (Tr. 18, 23, 34–35.) The Court listened to all of the deputies' testimony on these issues and observed their demeanor, and the Court found them highly credible.

In contrast, the Court finds Defendant's testimony to have been evasive, contradictory, and less than credible. Again, Defendant first testified that Sandoval advised him of "something," but that he did not understand him. (Tr. 52.) Then on cross-examination, Defendant admitted that Sandoval read him his rights in Spanish, but that he did not *accept* his rights.  (Tr. 64.)

The Court further finds that Defendant's criminal history is a factor on this issue. Defendant testified that he has been arrested before. (Tr. 59.) While not an "extensive" criminal history as in *Hearn*, that case still recognizes that a defendant's prior experience with law enforcement and the justice system is a factor to consider in assessing whether a waiver is knowing and voluntary.

In sum, the Court finds that the Government has met its burden of showing that Defendant made a knowing, voluntary, and intelligent waiver of his *Miranda* rights. *See Hearn*, 563 F.3d at 104. The waiver was "the product of a free and deliberate choice rather than

intimidation, coercion, or deception[,]" and it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal citations and quotations omitted). As a result, Defendant's motion to suppress the statements is denied.

### D.  Search of Car

#### 1. Parties' Arguments

Defendant denies giving Sandoval consent to retrieve the firearm from his vehicle. More specifically, Defendant argues that he "clearly denies giving permission to search the vehicle, consistent with his testimony that he wanted to see some kind of authorization to enter his property." (Doc. 46 at 4.)

In opposition, the Government relies on the "credible testimony" provided by Lint and Sandoval, which it argues proves by a preponderance of the evidence that Defendant consented to a search. (Doc. 25 at 1; Doc. 45 at 11.) The Government also points out that although Defendant denies giving consent to the search, he did not raise the issue of voluntariness during his testimony. (Doc. 45 at 11.)

#### 2. Applicable Law

Consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). In order to demonstrate valid consent, the Government must establish by a preponderance of evidence that the consent was voluntary, *Jenkins*, 46 F.3d at 451; *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) (en banc).

Additionally, even if a detention is initially or ultimately becomes constitutionally impermissible, a defendant's consent can, but does not necessarily, operate to "dissipate the taint of a prior Fourth Amendment violation." *Jones*, 234 F.3d at 242. As the Fifth Circuit has stated:

> When we analyze consent given after an unconstitutional detention, a two-pronged inquiry is applied: (1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will. *Jones*, 234 F.3d at 242. "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). We have made clear that affirmance for the Government on such consent as here is appropriate only if *both* questions are answered favorable to it: "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." *Id.* at 127–28. Furthermore, the Government "has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Jones*, 234 F.3d at 242 (internal quotation marks omitted).

*United States v. Macias*, 658 F.3d 509, 522–23 (5th Cir. 2011).

The Fifth Circuit has set forth the following non-exclusive factors to be used in determining whether consent is voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014) (citation omitted). "No single factor is dispositive," *id.*, and that the issue of whether consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Government's burden cannot be discharged by showing "no more than acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338 (citing *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)).

With respect to whether consent is an independent act of free will, courts in this circuit consider: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of

27

intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *United States v. Ansourian*, 487 F. App'x 155, 158 (5th Cir. 2012) (quoting *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (citations omitted)).

### 3. Analysis

Preliminarily, the Court must resolve the central question: did Defendant give consent to Sandoval to retrieve the firearm from his vehicle? Having listened to both Sandoval's and Defendant's testimony, and observing them on the stand in open court, the Court finds that he did.

Again, the Court finds Sandoval's testimony more believable than Defendant's. Sandoval testified that when he asked Defendant if he had a firearm, Defendant responded "yes." (Tr. 33, Doc. 41.) He then asked Defendant if he could retrieve the firearm and check it, and Defendant told him he could. (Tr. 33.)

In contrast, the Court found Defendant's testimony to be less than credible.

Accordingly, the Court believes Sandoval's testimony that Defendant gave him consent to search his truck. Therefore, the next question the Court must answer is whether Defendant's consent was given voluntarily. The Court finds that it was.

#### i.    Voluntariness of Custodial Status

As discussed above, Defendant was engaged in a voluntary consensual encounter at the time he purportedly consented to the search. As the deputies testified, he was "swinging his feet off the tailgate." (Tr. 23.) He was not in handcuffs nor was he under arrest. (Tr. 34.) Thus, this factor weighs in favor of the Government.

#### ii.    Coercive Police Procedure

With respect to the second factor, the Court also finds that this weighs in favor of the Government. Sandoval's testimony shows that he employed no coercive procedures to gain

28

Defendant's consent; rather he simply asked if Defendant if he could retrieve the firearm from the truck. (Tr. 33.) *See Tompkins,* 130 F.3d at 122 ("[C]oercive police procedures were absent, i.e., [Defendant] was not handcuffed until the search revealed the presence of [drugs], no threats or violence were used, and there was no overt display of authority....").

### iii.    Defendant's Cooperation with Police

With respect to Defendant's cooperation, the Government emphasizes that Defendant was cooperative throughout the entire encounter. (Doc. 45 at 12.) The Court agrees.

Sandoval, who obtained Defendant's consent to search, testified repeatedly that Defendant was cooperative with the officers' investigation. Again, he described the whole encounter as "very pleasant." (Tr. 35.) Likewise, Lint testified that, based on Defendant's body language, he showed no signs of uncooperativeness. (Tr. 23.) Accordingly, this factor also weighs in favor of the Government.

### iv.    Defendant's awareness of his right to refuse to consent

As the Government correctly observes, there is no evidence that the deputies informed Defendant of his right to refuse consent. (Doc. 45 at 12.) However, the Government argues that Defendant's prior arrest works to mitigate this. (*Id.*)

The Fifth Circuit has emphasized that "[p]roof of knowledge of the right to refuse consent is not required to show voluntariness." *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988); *see also United States v. Burcham*, 2016 WL 5723663, at *5 (M.D. La. Sept. 30, 2016), *aff'd*, 707 F. App'x 820 (5th Cir. 2018) (consent voluntarily given notwithstanding the fact that, under *Zavala*, this factor weighed against the Government because officer had possession of the defendant's license and registration when he asked for consent and had not informed defendant of his right to refuse; in affirming the decision, the Fifth Circuit reiterated

that this factor "is only one factor to consider in the inquiry and is not a prerequisite to effective consent"). As such, this factor is neutral.  Additionally, the Court concludes that Defendant's criminal history has little weight in either direction.

### v.    Defendant's Education and Intelligence

The fifth factor, level of intelligence and education, militates slightly in favor of the Government. *See United States v. Soriano*, 976 F.3d 450, 458 (5th Cir. 2020) (The factor of education and intelligence weighed marginally in favor of the government due to evidence that defendant, with six years of formal education in Mexico, understood the officer).

Although Defendant testified that he only had a sixth-grade education (Tr. 69), his actions and responses during the encounter do not indicate that he lacked the education or sufficient intelligence to comprehend what was going on.

Defendant spoke with Sandoval in Spanish, his native language. Defendant never indicated that he did not "understand what was going on," and, in fact, Defendant appeared to understand Sandoval, and "was very direct with all the answers that he gave us."  (Tr. 32, Doc. 41.) Further, Defendant acknowledged that he understood Deputy Sandoval. (Tr. 69.)

### vi.    Defendant's Belief Evidence Would be Seized

Finally, Defendant's belief that evidence would be seized also weighs slightly in the Government's favor. As the Government points out, Defendant may have known the discovery of the pistol would incriminate him. However, based on Sandoval's testimony, Defendant claimed that "the firearm was legal." (Tr. 33.) Therefore, although Defendant knew the deputies would find the firearm when they searched his truck, this shows that he did not think it would incriminate him. Accordingly, this factor weighs in favor of the Government.

### vii.    Defendant's Overall Consent

Based on the foregoing non-exclusive factors, under the totality of the circumstances, the Court concludes that Defendant's consent to search was voluntarily given and was not merely "acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338. It is true that, at the time of the consent, Defendant was not expressly informed of his right to refuse consent. However, Sandoval did not use coercive police procedures in obtaining consent, Defendant was cooperative throughout the encounter and consented to a search when asked, Defendant's education and intelligence do not suggest an inability to consent to a search, and Defendant likely believed that the search would not reveal incriminating evidence as he claimed the firearm was "legal." Therefore, Defendant's consent was voluntary.

### III.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress Evidence and Statements* (Doc. 23) filed by Defendant Julian Martinez-Velazquez is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>January 28, 2021</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**